CELIA GALLIN and Others, Suing upon Their Own Behalf as Stockholders and for the Benefit of All Other Stockholders of The National City Bank of New York Similarly Situated, and upon Their Own Behalf, as Beneficiaries, and for the Benefit of All Other Beneficiaries under the Trust Agreement Dated June 1, 1911, as Amended, for the Benefit of the Stockholders of The National City Bank of New York, Evidenced by an Indorsement on Certificates of Stock of The National City Bank of New York, Who May Elect to Come in and Contribute to the Expense of This Action, Plaintiffs, and ROBERT M. KLEIN (as Intervenor in the Cohen Actions) and Others (as Intervenors in the Consolidated Action), Intervenors, v. THE NATIONAL CITY BANK OF NEW YORK and Others, Defendants.

Supreme Court, New York County, May 25, 1935.

*David L. Podell* of counsel, for the plaintiffs.

*Hays, Podell & Shulman* of counsel, for the plaintiffs.

*Lupka & Pomerantz*, for the plaintiff Celia Gallin.

*Samuel A. Mehlman*, for the plaintiff Ethel Mehlman.

*Shaine & Weinrib*, for the plaintiff Anna Bashlow.

*Liebman, Blumenthal & Levy*, for the plaintiffs Sarah Cohen and another.

*Tolins & Jakobson*, for the plaintiff Morris S. Goldberger.

*Rasch & Gottlieb*, for Pansy G. Rasch, intervenor.

*Ernest Mahler* for Florence J. Cummins, intervenor.

*Weinstein & Levinson*, for Fred A. Apfelbaum, intervenor.

*Stephen K. Rapp*, for Golda H. Streep and another.

*McLaughlin & Stickles*, for the defendants The National City Bank of New York and another.

*Duryee, Zunino & Amen*, for the defendant The City Company of New York, Inc. (sued herein as " The National City Company ").

*Alexander & Green*, for the defendant P. A. Rockefeller.

*Beardsley & Taylor*, for the defendants Guy Carey and another.

*Chadbourne, Stanchfield & Levy*, for the defendant Charles E. Mitchell.

*Cotton, Franklin, Wright & Gordon*, for the defendant Gerard Swope.

*Curtis, Mallet-Prevost, Colt & Mosle*, for the defendant Gerrish H. Milliken.

*Davis, Polk, Wardwell, Gardiner & Reed*, for the defendants Sosthenes Behn and another.

*Donovan, Leisure, Newton & Lumbard*, for the defendants Gordon S. Rentschler and another.

*Dunnington, Gregg & Church*, for the defendant Percy R. Pyne, 2d.

*Le Boeuf & Winston*, for the defendant Floyd L. Carlisle.

*John E. Mack*, for the defendant James A. Stillman.

*Milbank, Tweed, Hope & Webb*, for the defendant Joseph P. Grace.

*Mitchell, Taylor, Capron & Marsh*, for the defendant James H. Perkins.

*Moore & Bell*, for the defendant Garrard B. Winston.

*Northrop, Schur & Sylvester*, for the defendant Eric P. Swenson.

*Proskauer, Rose & Paskus*, for the defendants Edward A. Deeds and others.

*Zalkin & Cohen*, for the defendant Hugh B. Baker,

FRANK C. LAUGHLIN, Referee.

*To the Supreme Court of the State of New York, Special Term, Part IV, New York County:*

On the 9th day of July, 1934, by an order of this court (See 152 Misc. 679), Mr. Justice DORE presiding, I, the undersigned, was appointed a referee " to inquire on the merits," in accordance with the opinion of the court rendered on the trial hereof and theretofore filed herein " into all the issues raised by the pleadings and proof in connection with the management fund of [defendant The National City Bank of New York] from its inception in 1923, and of the [defendant The National City Company] from its inception in 1921," and " to hear and report to the court " with my opinion thereon, but there was excepted from said order of reference all points relating to the Statute of Limitations; and it was further provided that the referee should take additional evidence and report on the evidence theretofore taken herein and on such additional evidence in accordance with the opinion theretofore filed herein on all issues in connection with the management funds, excepting the issues relating to the distribution of the management fund of The National City Company on July 1, 1929, and the issue as to the payment of $140,938.98 from said management fund in January, 1931, which issues had been determined by the court by said opinion.

Immediately after the entry of said order of reference, representatives of the parties hereto appeared before me and it was agreed that there should be no formal hearing until last fall.

In the meantime I took the oath of office as referee and took with me on vacation a copy of the evidence taken in open court herein before the order of reference, and of the brief submitted to the court and of the opinion of the court. The first formal hearing before me as referee was had on the 17th day of December, 1934, and the last evidence was taken on the 8th day of March, 1935. During the hearings, at all of which the parties appeared by the same attorneys and counsel as appeared for them on the trial before the order of reference, there were frequent discussions of the evidence taken before the order of reference; and all further evidence that either party deemed would have any material bearing on the issues was presented. The testimony taken before me consists of 1,629 pages, and a great number of exhibits were received in evidence.

There is no conflict in the evidence as the record now stands. I have had the assistance of counsel and accountants of both parties with respect to the figures and computations in their reports, and, therefore, I am of opinion that the findings of fact which I am

making will not be questioned with respect to the evidence on which they are predicated; but some of the conclusions of law which I have drawn therefrom will doubtless be challenged.

The order of reference is to be considered in the light of the opinion of the court preceding it, which decides many questions of fact and law arising on the issues herein, and particularly the points of law with respect to the legal duties and liabilities of directors of the defendant corporations, for which they may be called to account at the instance of minority stockholders.

As stated in the opinion, " the management fund or incentive compensation plan " of the bank was established in 1923, and that of the company in 1921 by resolutions of the boards of directors without prior submission to the stockholders. I find that although the stockholders of the bank were subsequently informed of the establishment of its management fund, there was never any formal action by the stockholders approving or disapproving it and that the stockholders of the company were never informed with respect to the management fund plan for it and never took action thereon.

As found by the court in the opinion the formula for the management fund adopted by both boards was substantially the same and provided that out of the net profits for each year there should first be set aside for the stockholders eight per cent on the invested and employed capital, and one-fifth of the remaining net profits for each year should be apportioned " by periodical action of the boards among the executives responsible for the management, and the remaining four-fifths distributed to the shareholders." The court then states in the opinion that plaintiffs charge " that the directors of both bank and company breached their common-law fiduciary duty in the establishment and operation of the funds and in the distribution of moneys thereunder, claiming that compensation of officers was increased exorbitantly and excessively, amounting to waste and spoliation of corporate assets; " and that plaintiffs also contend that there were certain improper eliminations of losses authorized by the boards in computing the management funds, and that other deductions, that were wholly unauthorized and arbitrary, were made, resulting in alleged aggregate overestimation in favor of managing officers of $1,830,075.36, for which " as well as for all other allegedly excessive, improper and improvident payment out of management funds " the directors are personally liable.

The court next took up and decided two points with respect to the management fund of the company for the year 1929, and exonerated the defendants from liability for a distribution of part of the management fund on July 1, 1929, and from all liability on

account of a settlement made with the distributees in December, 1929, with respect to the liability of such distributees to refund part of the moneys received; but held the directors liable under a resolution of December 30, 1930, for $140,938.98 distributed to the beneficiaries of the management fund on account of undistributed accumulations of the management fund for the year 1928. The court, in the opinion, thereupon proceeded to consider the charge in relation to the management fund to the effect that the directors breached their common-law fiduciary duty in the establishment and operation of the fund and especially in approving, voting and allowing compensation that was claimed to be so excessive as to be a misuse or waste of corporate assets, and held that a predetermined incentive compensation to corporate officers, based on a share of profits in addition to salary, " if fair and not oppressive," is proper, but held that the reward " must have reasonable relation to the value of the services for which it is given and must not be, in whole or in part, a misuse or waste of corporate funds, or a gift to a favored few, or a scheme to distribute profits under a mere *guise* of compensation, but in fact having no relation to services rendered," and that " the compensation must be in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporate earnings, profits and prosperity, increase in volume or quality of business or both, and all other relevant facts and circumstances; nor should it be unfair to stockholders in unduly diminishing dividends properly payable." The opinion then states the number of directors of the bank and of the company, and that only three of the average of twenty-three directors were participants at any time in the management fund of the bank and that the remaining directors had no personal interest in the management fund, and that at no time did more than three of the average of eight directors of the company participate in the management fund, and that the other directors were disinterested, and that the directors who were not officers were stockholders of large blocks of stock and personally lost in dividends proportionately on account of the money voted to the management funds. The opinion then holds that " even assuming the legality and propriety of the creation and establishment of the funds and the formula adopted for distribution thereunder," it was nevertheless the duty of the court under the decision in *Rogers* v. *Hill* (289 U. S. 582) " to make an inquiry to determine whether the payments attacked constituted misuse and waste of the corporate funds, and, if so, to what extent." It is also stated in the opinion that in *Rogers* v. *Hill* (*supra*), although it appeared

that the president of the American Tobacco Company, under the management fund and formula of that corporation, received in one year $842,507.72 in addition to a large salary and cash credits, the court expressly held that this gave rise " to no inference of actual or constructive fraud," but that the payments under the management fund plan and formula had " become so large as to warrant investigation in equity in the interest of the company " at the instance of a minority stockholder, and also held that the dissenting opinion below stated the applicable rule as follows: " If a bonus payment has no relation to the value ef services for which it is given, it is in reality a gift in part and the majority stockholders have no power to give away corporate property against the protest of the minority."

The opinion of Mr. Justice DORE then holds under the doctrine enunciated in *Rogers* v. *Hill* (*supra*) that the compensation received by a few of the officers of the bank and company under the management fund plan and formula, although not giving rise as matter of law to an inference of actual or constructive fraud or other breach of duty, warranted a full investigation " to determine whether there was in fact a deliberate or actionably negligent waste of corporate assets and, if so, to what extent," which inquiry, however, was not " to substitute the court's discretion for the discretion of the directors, if that has been honestly and fairly exercised," and that the directors acting in good faith have a right to fix compensation of executive officers, and that ordinarily their discretion as to the amount of compensation is final, " except where the circumstances show oppression, fraud, abuse, bad faith or other breach of trust," and that " if clear oppression, bad faith, or other breach of trust is shown, the courts will give redress and determine to what extent the compensation is excessive. But plaintiffs must bring the case within one of the exceptions that are in each case predicated on a breach of legal duty with consequent damage to the corporation." The opinion then quotes with approval an opinion in *Seitz* v. *Union Brass & Metal Mfg. Co.* (152 Minn. 460, 464; 189 N. W. 586) as follows: " The dissenting stockholder should come into court with proof of wrongdoing or oppression and should have more than a claim based on mere differences of opinion upon the question whether equal services could have been procured for somewhat less."

The opinion then proceeds to state that the issues are complicated not merely by the allegations of excessive amounts voted by the boards of directors, but by claims of alleged improper eliminations authorized by the boards of certain losses in computing the management fund and still other eliminations claimed to have been

unauthorized, " as a result of which the funds are, in plaintiffs' elaborate schedules, revised downward by $1,830,075.36." The court then holds that the determination of these claims involves the examination of long, complicated accounts and could not be determined on the record then before the court, and that " the facts concerning the establishment and operation of the management funds, whether such funds were annually properly set up with or without improper deductions, and the question of the legal liability of directors, can only be ascertained and properly determined after a full presentation of all the facts before a referee, who shall take the testimony and report with his opinion to the court concerning all the issues involved in the management funds," and an order of reference was granted and the referee was directed on all of the testimony in the record and such additional testimony as might be presented before him to " report whether or not breaches of duty are established; whether or not any of the sums paid to the officers in the higher brackets of both the bank and the company, through such breaches of duty, if found, were excessive and a waste of corporate assets, and, if so, in what aggregate amounts by years; whether or not improper eliminations of losses were actually made, or the usual customary and proper accounting practice followed; also whether there is established any actionable negligence of directors in failing properly to supervise or examine the yearly provisions for the management funds to satisfy themselves with reasonable care and diligence that the computations were fair to stockholders, bank and company, as well as recipients, and also whether the proceedings were ratified by the stockholders."

None of the acts or proceedings in question here were ever ratified by the stockholders of either the bank or the company; but it will be remembered that the stockholders of both bank and company were the same. The stockholders of the bank were informed that a management fund plan had been adopted for it, but the stockholders were not informed that such a plan had been adopted for the company.

The law is well settled by the decisions hereinbefore cited, and many other like authorities, which, in view of the opinion of Mr. Justice DORE, I do not deem it necessary to analyze or cite, that the magnitude of the total compensation received by the different officers of the bank and company as salaries and under the management fund plan in and of itself, does not show a breach of duty on the part of the directors or entitle the plaintiffs to recover, but merely requires an investigation by the court with respect to the existence of a cause of action and necessarily leaves the burden of proof on the plaintiffs.

On the main issues with respect to the charges of fraud and bad faith, and as to whether the compensation paid to the senior and some of the junior managing officers was so excessive that it constituted a gift or waste of funds within the principles of law hereinbefore stated, the plaintiffs have adduced no substantial additional evidence on the reference. They have presented some opinion evidence on this subject, but it is of very little, if any, probative force for the reason that it is not predicated on like official positions or services.

All of the present defendants were directors of either the bank and company or one of them at all or part of the times in question. The case, therefore, rests wholly on the legal liability of directors.

Most of the directors have appeared before me and testified and have been cross-examined at length. Each of them says, and it was stipulated that those who were not called as witnesses would give like testimony, that he was in no manner personally interested in the management fund of either the bank or the company, that he received no benefit therefrom other than were shared by all stockholders, that in the performance of any of his acts of which complaint is made he was not motivated by any desire or purpose other than to further what he deemed to be the best interests of the bank or company, that at all times in question he was a very substantial holder of the capital stock of the bank or company, as were members of his family and many of his friends, that his interest was identical with those of all other stockholders, that the services rendered by these executive officers were not the ordinary routine services in the management of a corporation, but were mainly and almost exclusively in getting new customers and increasing the business, deposits and profits of the bank and the business and earnings of the corporation. The evidence shows that the directors were all men of large affairs. Many of them were at the head of some of our largest business enterprises and others were prominent members of the bar of extensive experience. The executives who participated in the management fund constituted the best qualified men obtainable for the purposes for which they were selected in the principal lines of business and industry in the United States and in foreign countries. The evidence shows that under the management of these executives who participated in the management fund the capital surplus and undivided profits of the bank and company increased continuously from $112,739,943.25 in 1923 to $352,277,960.95 in 1929, and that the total net operating earnings of the bank and company continuously increased from $14,017,374.22 in 1923 to $39,902,750.37 in 1929. The evidence further shows that the bank deposits in 1923 were $728,640,082.22 and that there

was a very large increase every year until 1929, when they were $1,649,554,260.74. The evidence further shows that during those years of continuing prosperity there was a great demand for high-class executives competent to render the best services in such lines. The management fund was established primarily as an incentive to induce these executives to remain with the bank or company.

I am of the opinion and report that the bank and company had authority to adopt the management fund plans and the formula which they did adopt for providing for the management funds. These acts were not only within the powers of the directors of the bank and company, but they were fair and reasonable to the bank and company and their stockholders, and no more than fair to the executives.

The senior and junior executives who participated in the management fund of the bank increased from twenty-three in 1923 to fifty-three in 1929, and those who participated in the management fund of the company increased from nine in 1921 to thirteen in 1927, and were twelve in 1928, and eleven in 1929. They were selected by the executive committee of the bank by authority of the board of directors and by the board of directors of the company, and in their selection no director who was to be a participant in the management fund took part. The selections in every instance were made exclusively by directors who were not participants in the management fund. The evidence shows that such selections were made by the free, uninfluenced acts of the directors who made them after acquiring full information with respect to the particular services rendered by each of those selected to participate in the management fund and in the belief on the part of such directors that the services which those so selected were rendering to the bank and company were of such value and benefit to the bank and company that it was to the best interests of the bank and company to have the management fund distributed only to them. In order to aid the directors in determining the extent to which those who were selected to participate in the management fund should share therein, a plan was adopted and followed under which by secret balloting of those selected to participate in the management fund the directors were advised by each with respect to his opinion concerning the percentage of the management fund which each of his coparticipants should receive, based upon his knowledge of the services rendered by them. The directors did not deem themselves controlled by such balloting, but they were undoubtedly influenced, and properly so, thereby, and after receiving the results of the balloting they made the apportionment themselves. The evidence shows that in communicating these opinions

to the directors the participants in the management fund were in no manner dominated or influenced and that there was no effort or attempt to dominate or influence them. The evidence also showed that it would not have been to the best interests of the bank or company to have extended participation in the management fund to all officers and employees and that such participation was properly confined to those who were rendering extraordinary services for the benefit of the bank and company. No liability, therefore, can be predicated on the fact that more officers and employees were not selected to participate in the management fund. The directors in making such apportionment allotted very large percentages of the management fund to a few of the principal executives. For a time the total compensation of these leading executives by salary and participation in the management fund could not be claimed to be excessive, but as the profits of the bank and company greatly increased, the total compensation by salary and participation in the management funds of two or three of the leading executives became very large and so large that it probably could not have been sustained if declared as regular annual salaries.

In my opinion the only theory on which the present defendants could be held liable is for not changing the apportionment of participation in the management funds, when it appeared that through the great ability and untiring efforts of the executives, who were inspired by the management fund plan to exert themselves to the utmost of their capacity to extend and increase the business and profits of both the bank and company, the management fund share of the profits became so large that under the apportionment of participation therein two or three of the participants at times received total compensation from the bank and company very largely in excess of what would have been warranted as annual salaries, for I believe that the tremendous increase in profits was largely due to the extraordinary efforts and services of the executives over and above what would have constituted proper performance of the duties of the offices they respectively held, and that at no time were the profits of the bank and company so large that in fairness to the stockholders the percentage of net profits apportioned to the management fund under the formula should have been reduced. The directors were chargeable with knowledge of the total compensation received by each of the participants in the management fund by way of salary and by participation in the management fund. They frankly admit that they had such knowledge and acted under no mistake of fact. They realized that in this manner some of the executives were receiving very large compensation which

seems now, during this extraordinary depression period, unwarranted compensation, but which did not seem so then when the future was rosy, and few, if any, anticipated that the great prosperity of those days would not continue. The evidence shows that the directors believed that any reduction in the percentage of profits allotted to the management funds or their failure to distribute the entire amount of the management funds or to reapportion it so that the leading executives would receive less and the others would receive more of it was not to the best interests of either the bank or company and that any such action might have had a demoralizing effect on those executives who had been so instrumental in increasing the profits of the bank and company. The point of law presented by these facts is whether that, at most, constituted a mere error of judgment on the part of the directors for which they are not liable or whether it constituted negligence for which they are liable, the rule of law with respect to the liability of directors in such circumstances being that it is their duty to exercise such care as prudent men would exercise in the performance of their own business. I am of opinion that they should not be adjudged guilty of negligence, for they were in a sense, on account of their large stock interests, acting in their own business and their own interests were affected by their acts precisely the same as were the interests of all other stockholders. They acted with full knowledge of all material facts and it is inconceivable to me that they would all fail to exercise the care and caution which would be exercised by a prudent man in handling his own affairs, for surely some of them were men of such prudence. I, therefore, find and report that none of the defendants should be held liable on the theory that they authorized or permitted the payment of compensation to the executive officers so great as to constitute a gift or waste of the funds of the bank or company.

The amount, however, upon which this claim of excessive payments to these executives is predicated will be very largely reduced owing to errors in the computation of the management fund which will now be discussed. ''

The computation of the management fund of the bank in each year was in accordance with the management fund plan and formula adopted by the board of directors, but the computation of the management fund for the company in several years was not made in accordance with the management fund plan and formula, and these errors very substantially erroneously increased the management fund for those respective years. The claims of improper eliminations of losses in computing the management funds and of other eliminations from capital, surplus and undivided profits in

making such computations are those referred to in the opinion of Mr. Justice DORE.

The only figures before the executive committee or the board of directors of the company with respect to the management fund when they authorized distribution of the fund was a statement prepared by the auditor or controller or someone in the controller's department "showing merely the net amount which was available for distribution." Such a statement when prepared was given to Mr. Mitchell, who in turn presented it to the executive committee of the company, and it contained the only figures relating to the computation of the management fund which were laid before the committee when it made the various distributions. The executive committee did not ascertain or know how the management fund was computed, or whether any current losses had not been eliminated or there had been any elimination from capital, surplus and undivided profits. The members of the committee had before them only the net result of the computations made by or under the supervision of the controller on the advice of executive officers. The distribution of the management fund was always made by the directors who had no personal interest therein, and no director who was a participant in the management fund took part in such distribution. I have no doubt that the disinterested directors who directed the distribution of the management fund acted in entire good faith in thus relying on the controller's department to make the computations with respect to the management fund, but as matter of law, in the circumstances here presented, they were not warranted in so doing, and certain current losses, which will be presently stated, not having been deducted from profits and there having been certain improper deductions from capital, surplus and undivided profits in computing the eight per cent in setting up the management fund, the directors of the company are answerable to the stockholders for their failure properly to supervise the computations for the management fund.

Doubtless they had confidence in the officers and employees who performed this work; but, nevertheless, they should have realized that they were thus leaving the computations for the management fund in the hands of, or under the supervision of, those who were entitled to participate in the management fund and whose interests were, therefore, adverse to those of the stockholders. Doubtless these errors in the computation of the management fund were made on the erroneous theory that it was not intended to take into consideration the losses which were omitted or the assets which were excluded in determining the management fund on account of the fact that those participating in the management fund had nothing

to do with said transactions originally and there had been some official action tending to show this in part. It was incumbent upon the directors to see to it that the formula was followed with strict impartiality and they could not delegate this duty to those who would participate in the fund or to others who acted under the supervision and guidance of the latter. The board of directors and executive committee of the company, to insure the proper computation of the management fund, should have intrusted that work to officers or employees in no manner interested in the management fund. Failure so to do constituted a breach of their duty as directors and subjects them to liability for the restoration of moneys improperly paid through such erroneous computations of the management fund.

The specific items of unauthorized deductions fall within the classifications enumerated by Mr. Justice DORE in his opinion, and they will be discussed in the order in which they are stated in the opinion.

It appears from Exhibits 119-B and 119-C in Schedule H of Plaintiffs' Exhibit 220 that during the year 1927, without any authorization of the board or the executive committee or stockholders, certain items of current losses were not deducted from profits in calculating the management fund. These exhibits show that on the books of the company there was deducted from capital surplus and undivided profits for the period from January 1, 1927, to February 16, 1927, $8,429,529.09, which is described as being applicable to " Vertientes Sugar Securities." Interest on this item for this period at the rate of eight per cent per annum would amount to $84,295.92, but this amount was not deducted from net profits. The books of the company also show there was deducted and eliminated from capital, surplus and undivided profits for the period from February 16, 1927, through December 31, 1927, $5,908,467.66, which is shown to be applicable to " Cuban Dominican Sugar Securities." Interest at the rate of eight per cent per annum on this item for that period amounts to $413,592.69, but this item was not deducted from net profits in computing the management fund. Neither the Vertientes Sugar Securities nor the Cuban Dominican Sugar Securities items are covered by or included in the resolutions dated March 27, 1923 (Plaintiff's Exhibit 125), or January 25, 1927 (Plaintiff's Exhibit 127), nor by any other management fund resolutions which were placed in evidence. Interest at eight per cent per annum on these two items would have amounted to $497,888.61 had both of said eliminations been included in capital surplus and undivided profits pursuant to the management fund formula. Twenty per cent of this amount should have been

applied in reduction of the management fund for 1927, which would have reduced it to the extent of $99,577.72. Thus, as a result of these unauthorized eliminations from capital, surplus and undivided profits, the management fund of the company for the year 1927 was overstated to the extent of $99,577.72, and the directors of the company in office at the time are liable therefor.

The charges in surplus accounts claimed to have been disregarded in management fund computations without any authorization therefor relate to the elimination of the so-called " Santa Clara Sugar Loss."

Plaintiffs contended on the trial that among the unauthorized eliminations which had been charged against the surplus account, there was an item in the year 1926 described as " Camaguey Sugar Loss " in the amount of $1,820,000 and that such loss was eliminated from the computation of management fund for that year without any authorization therefor. However, at the end of the trial there was introduced in evidence by the defendants a resolution of the board of directors of the National City Company adopted at their meeting on December 28, 1926 (Defendant's Exhibit UU), which in express terms authorized the exclusion of the said loss in computing the management fund. This evidence clearly indicates that the elimination was duly authorized, was proper, and removes it from the group of items claimed by plaintiffs to be unauthorized eliminations.

Similarly, upon the trial of the action and in their briefs submitted upon the conclusion thereof, the plaintiffs and defendants both referred to the 1927 and 1928 deductions relating to Cuban Dominican Sugar Corporation stock (hereinafter described more fully) as being losses charged to surplus, which were disregarded in computing the management fund of the National City Company for the years in question.

The additional evidence submitted during the course of the reference, including the transcripts of the book of account of the company, which will be referred to hereinafter, and which are summarized in plaintiff's Exhibit 245, show that these items of losses were never charged to surplus, but were charged as losses in the accounts recording current security transactions. This additional evidence, which is undisputed, therefore, takes these Cuban Dominican items out of the category of this classification and places them clearly within the third category, which will be discussed hereinafter.

Therefore, the sole item of unauthorized losses charged to surplus account, remaining for consideration is the so-called Santa Clara Sugar loss. It is undisputed in the evidence that during the year

1922 there was charged to the surplus account (Plaintiff's Exhibit 119-A) an item there described as Santa Clara Sugar loss in the amount of $2,223,300. Although this item is in specific terms described as a loss, and conceded to be such by the defendants, it nevertheless was disregarded in computing profits for management fund purposes. In the absence of any action or resolution by the board expressly authorizing the elimination of this item of loss from the computation of the management fund, it is unimportant that this item was charged on the books to surplus rather than as a current operating loss. The record shows clearly that whenever the executive committee and board of directors of the bank desired to modify the formula so as to eliminate a loss, whether charged to surplus or as a current operating loss, they effected such modification of the formula by an express resolution or action duly adopted at a regular or special meeting of the executive committee or the board.

Since there was no such resolution and no such action by either the executive committee or the board with respect to this Santa Clara loss, it must be deemed to be a loss which should have been taken into account in computing the management fund.

The directors of the company are, therefore, liable for failing to deduct this item in computing the management fund. If this loss of $2,223,300 had been properly considered in computing the management fund for the year 1922, it would have resulted in reducing the amount of the management fund to the extent of twenty per cent of that amount, namely, $444,660.

There was introduced in evidence a resolution passed by the board of directors of the company on January 23, 1923 (Plaintiffs' Exhibit 124). This resolution reads as follows: " Be It Resolved, that in computing the profits of the company from time to time for the purpose of ascertaining amounts due to officers of the company in accordance with the provisions of the management fund, and to branch office managers and other employees under profit-sharing plans, the executive officers are authorized and directed to disregard any profits or losses which may directly or indirectly accrue out of the purchase by this company from the National City Bank of New York of the Six Per Cent Collateral Notes of the Santa Clara Sugar Company and the First Mortgage Bonds of Central San Cristobal."

Prior to the time when this resolution was adopted, not only had the management fund for the second half of the year 1922 been computed (Plaintiffs' Exhibit 112) but said fund for the second half of the year 1922 had in fact actually been paid out. Consequently it cannot be said that the resolution of January 23, 1923, in any way modified the formula created for the year 1922.

But an examination of the resolution passed on January 23, 1923, clearly shows that on its face it does not purport to cover the year 1922. Nor was it intended to or made retroactive by its terms. It is clear from the language of this resolution that it was intended to and did in fact authorize only the elimination of any losses resulting from this Santa Clara item beginning with the year 1923 from the computation of the management fund.

The resolution of January 23, 1923 (Plaintiffs' Exhibit 124), therefore, does not in any way make the 1922 Santa Clara loss an authorized deduction, nor does it in any way affect the liability of the directors for their failure to deduct said 1922 Santa Clara loss from the computation and distribution of the 1922 management fund of the company.

The directors of the company in office at the time are liable in connection with this 1922 Santa Clara Sugar loss.

Additional data relating with respect to items involving the contested propriety of corporate accounting in connection with the computation of the management funds relates entirely to questions arising through the failure to deduct the losses upon Cuban Dominican Sugar Corporation stock during the years 1927 and 1928.

Upon the reference much additional evidence was offered concerning the transactions resulting in these losses, the manner in which the said items were recorded upon the books of account, and questions of accounting procedure relating to their deduction. The result of this additional evidence offered by the plaintiffs, substantially all of which was undisputed, was to eliminate all technical accounting controversy with respect to the character of these Cuban Dominican Sugar Corporation items, their treatment from an accounting standpoint, and their effect upon the computation of the management fund of the company for the years 1927 and 1928.

As hereinabove indicated, this additional evidence among other things established the fact that these items were not charged to surplus account, but were in fact treated in the books of account as current losses through security transactions, and for that reason are considered under this category.

The nature and character of these items appear from the undisputed facts to be as follows:

In April, 1926, the National City Company entered into an underwriting syndicate with W. A. Harriman & Company, Inc., and Cassatt & Company, the terms of which are set forth in an underwriting agreement which is in evidence as plaintiffs' Exhibit 232. This underwriting agreement relates to 500,000 shares of Cuban Dominican stock without par value of the Cuban Dominican Sugar

Corporation, a corporation which was then being formed as the result of a reorganization of previously existing Cuban Dominican Sugar corporate entities.

The facts relating to this reorganization are fully set forth in the listing application filed with the New York Stock Exchange under date of May 28, 1926, a copy of which is in evidence as plaintiffs' Exhibit 236.

In connection with this reorganization 800,000 shares were being offered on subscription to stockholders of the Cuban Dominican Sugar Corporation at $20 per share. Certain stockholders and other underwriters had agreed to take up subscriptions to the extent of 300,000 shares. The underwriting syndicate, of which the company was a participating member, agreed to take up any portion of the remaining 500,000 shares of Cuban Dominican Corporation stock at $20 per share, which the stockholders did not themselves subscribe to and purchase. For this underwriting commitment of $10,000,000 the syndicate was to receive a commission of $700,000 in cash, plus 65,000 shares of Cuban Dominican Sugar Corporation common stock. On the basis of the offering price at $20 per share, the aggregate commission would thus amount to $2,000,000 in cash and stock (Plaintiffs' Exhibit 233).

That the syndicate managers, including the company, contemplated the marketing of this stock as a regular syndicate flotation, is further shown by the fact that the syndicate managers agreed among themselves to set up a " market fund " not in excess of $1,000,000 to be used in the purchase and sale of shares of Cuban Dominican Sugar Corporation stock during the period of the underwriting agreement. This syndicate agreement (dated April 15, 1926) was ultimately extended until November 1, 1927. The extension agreement was also marked in evidence as. plaintiffs' Exhibit 234.

As appears from the syndicate agreement, plaintiffs' Exhibit 232, the company accepted a $6,000,000 participation therein, made up of the following elements:

| | |
|---|---:|
| A prior obligation to take up the first 175,000 shares unsubscribed for at $20 per share | $3,500,000. 00 |
| An agreement to take up one-third of the unsubscribed shares in addition to 175,000 shares, being a maximum commitment of one-third of 325,000 shares at $20 per share | 2,166,666 67 |
| One-third contribution toward the market fund, being a maximum of one-third of $1,000,000 | 333,333 33 |
| Total commitment | $6,000,000 00 |

In consideration of this commitment the company was to receive as its share of the underwriting commission the following cash and shares, the shares being valued at the offering price of $20 per share:

| | | |
|---|---:|---:|
| Cash............................................... | $233,333 | 34 |
| 23,334 shares at $20 per share................... | 466,680 | 00 |
| Total............................................ | $700,013 | 34 |

As a result of its participating in the underwriting syndicate, the company had acquired by November, 1927, when the syndicate terminated, a total of 332,705 shares of Cuban Dominican Sugar Corporation capital stock at an aggregate cost of $5,931,833.34. The elements entering into the cost of these shares as recorded in the books of account of the company are as follows:

| | | |
|---|---:|---:|
| 175,000 shares at $20, per underwriting agreement...................................... | $3,500,000 | 00 |
| 123,290 shares at $20, additional shares taken up from the underwriting syndicate............... | 2,465,800 | 00 |
| 11,081 shares purchased in the open market through the operation of the syndicate market fund, at actual cost....................................... | 199,365 | 68 |
| 23,334 shares as commission received in connection with underwriting, carried on books at nominal value........................................... | 1 | 00 |
| | $6,165,166 | 68 |
| Less cash commission received.................... | 233,333 | 34 |
| 332,705 shares at net cost...................... | $5,931,833 | 34 |

The undisputed evidence is that the foregoing items are entered upon the books of account of the company in the following manner:

(1) The 175,000 shares at $20 per share, aggregating $3,500,000, appears in the ledger account marked " Cuban Dominican Sugar Corp'n Cap Carrying," copy of which has been put in evidence and marked plaintiffs' Exhibit 241.

(2) The 123,290 shares at $20 per share, aggregating $2,465,800, likewise appears in the foregoing ledger account marked plaintiffs' Exhibit 241.

(3) The 11,081 shares acquired at a cost of $199,365.68, through the operation of the syndicate market fund, appears in a ledger

account headed " Cuban Dominican Sugar Capital Stk Jt Carrying," copy of which is in evidence marked plaintiffs' Exhibit 240.

All of the accounts and bookkeeping entries in the foregoing items numbered " (1)," " (2) " and " (3) " are in the usual form regularly employed by the company for the recording of participations by it in underwriting syndicates in the regular course of its business.

(4) The 23,334 shares received as a commission and carried on the books at a nominal value of $1 appear recorded in a ledger account headed " Cuban Dominican Sugar Corp. Capital Stock — Inactive," copy of which is also in evidence, marked plaintiffs' Exhibit 237.

(5) The cash commission received amounting to $233,334.34 appears recorded in a ledger account entitled " Cuban Dominican Sugar Cap Stock — Original Terms," copy of which is in evidence as plaintiffs' Exhibit 238. This ledger sheet is supported by cash ticket No. 120,168 showing that on June 19, 1926, the National City Company received a check from W. A. Harriman & Company, Inc., in the amount of $233,333.34, pursuant to the original terms of the underwriting syndicate in Cuban Dominican Sugar Corporation capital stock. This cash ticket is also in evidence as plaintiffs' Exhibit 239. This cash commission was not absorbed in the company's profit account but was used as a reduction of the cost of the securities taken under the syndicate agreement.

(6) The ledger account (Plaintiffs' Exhibit 237) headed " Cuban Dominican Sugar Corp. Capital Stock — Inactive," likewise shows on November 5, 1927, a balance of 332,705 shares on hand at a total cost of $5,931,833.34.

The ledger sheet (Plaintiffs' Exhibit 237) shows a sale as of December 5, 1927, of 332,705 shares of Cuban Dominican Sugar Corporation stock at $9 per share, the aggregate sales proceeds being $2,994,345, resulting in a loss of $2,937,488.34. This ledger sheet indicates the closing out of this loss in the usual manner. The general ledger and other records of the company indicate that this loss of $2,937,488.34 was charged against the general ledger account " Sole Account Profits," the account which carried the profits and losses on security operations of the National City Company in the regular course of its business.

It is thus evident from the books of account of the company, and it is now conceded by the defendants, that this loss is not treated as a charge to surplus on the books of account of the company, but is included in the account which records the current profits and losses from security operations.

In the computation of the management fund for the year 1927 (Plaintiffs' Exhibit 119-C) this loss on the sale of these shares of Cuban Dominican Sugar Corporation stock was not deducted. This fact further appears on plaintiffs' Exhibit 119-A, which specifically lists this loss as an item which was not deducted for management fund purposes. Plaintiffs' Exhibit 119-B indicates, however, that there was deducted in the computation of the management fund the amount of $398,357.53, representing the tax saving resulting from the Cuban Dominican Sugar Corporation stock loss. This income tax adjustment offsets to the extent of $398,357.53 the failure to deduct the loss from the management fund computation. The net result in relation to the calculation of the management fund for the year 1927 is as follows:

| | |
|---|---:|
| Loss not deducted................................ | $2,937,488 34 |
| Less tax adjustment deducted.................... | 398,357 53 |
| Net amount of loss not deducted............. | $2,539,130 81 |

| | |
|---|---:|
| Twenty per cent of above, reduction of management fund based upon deducting full amount of loss........................................ | $507,826 1 |

The ledger sheet headed " Cuban Dominican Sugar Corp. Stock — Inactive Securities," copy of which is in evidence marked plaintiffs' Exhibit 243, records the purchase by the company of 332,705 shares of Cuban Dominican Sugar Corporation stock for the aggregate flat sum of $3,000,000.

This ledger account (Plaintiffs' Exhibit 243) likewise shows the sale on December 31, 1928, of these 332,705 shares at $4 per share flat, for the aggregate sum of $1,330,820, less expenses in connection with the sale, consisting of auctioneer's fees, etc., amounting to $2,520. Plaintiffs' Exhibit 243 records the resulting loss of $1,617,700. It further indicates the closing out of this loss in the usual manner. The general ledger and other records of the company indicate that this loss of $1,671,700 was charged against the general ledger account " Sole Account Profits," the account which carried the profits and losses on security operations of the company and the regular course of its business. The books of account of the company, therefore, show, and this fact is likewise now conceded by the defendants, that this loss, sustained in 1928 as a result of these transactions in Cuban Dominican Sugar Corporation stock, was also treated, not as a charge to surplus on the books of account

of the company, but are included in the account which records the current profits and losses from security operations.

In the computation of the management fund for the year 1928 (Plaintiffs' Exhibit 119-C) this loss on the sale of these shares of Cuban Dominican Sugar Corporation stock was not deducted. This fact further appears on plaintiffs' Exhibit 119-A, which specifically lists this loss as an item which was not deducted for management fund purposes. Plaintiffs' Exhibit 119 indicates, however, that there was deducted in the computation of the management fund an amount of $200,604, representing the tax saving resulting from the Cuban Dominican Sugar Corporation stock loss. This income tax adjustment offsets to the extent of $200,604 the failure to deduct the loss in the computation of the management fund for the year 1928. The net result in the calculation of the management fund for the year 1928 is as follows:

| | | |
|---|---:|---|
| Loss not deducted | $1,671,700 | 00 |
| Less tax adjustment deducted | 200,604 | 00 |
| Net amount of loss not deducted | $1,471,096 | 00 |
| Twenty per cent of above — reduction of management fund based upon deducting full amount of loss | $294,219 | 20 |

From the foregoing enumerated exhibits, and from Exhibit 245 which summarizes the contents of the other exhibits, it is established beyond dispute that these shares of Cuban Dominican Sugar Corporation stock were acquired by the company through its participation in an underwriting syndicate in the regular course of its business; that the said underwriting by its undisputed terms offered the prospect of large profits and obviously was entered into for that reason; that the listing application filed with the New York Stock Exchange (Plaintiffs' Exhibit 236) establishes the fact that the Cuban Dominican Sugar Corporation, with the new financing provided for it by this underwriting syndicate, was a corporation with substantial assets and adequate working capital, the stock of which might well prove to be of great value; that the National City Company actually received its share of the cash commissions earned through this underwriting; that the loss ultimately resulting from this syndicate operation was recorded in the ledger account which contained current profits and current losses from security operations; that the undisputed facts offered

with respect to these items support the conclusion that these were losses incurred by the company in the regular course of its business and should have been deducted in computing the management fund of the National City Company for the years 1927 and 1928.

The directors in office at the time are liable for the failure to deduct the 1927 and the 1928 Cuban Dominican Sugar Corporation stock losses.

Three items, two in 1923 and one in 1927, were excluded from capital surplus and undivided profits in computing the management fund of the company for those years.

Those in 1923 were the amount invested by the company under prior management, in six per cent collateral notes of Santa Clara Sugar Company and first mortgage bonds of "Central San Cristobal;" and the other was stock of the General Sugar Corporation in the amount of $25,000,000, which the company intended to introduce into its balance sheet on or before February 15, 1927.

On the reference before me, the propriety of these exclusions were not in dispute because all of them were expressly authorized in advance by resolutions of the boards of directors and, therefore, they should be, and are, approved.

This being a suit in equity, interest is discretionary with the court. (Civ. Prac. Act, § 481; *King* v. *Talbot,* 40 N. Y. 76, 95; *Bates* v. *Dresser,* 251 U. S. 524; *Ellis* v. *Kelsey,* 241 N. Y. 374, 379, 380.) In *Bates* v. *Dresser* (*supra*) Mr. Justice HOLMES, in writing for the court and referring to interest in an equity suit, said: "It is a question of discretion, not of right."

None of the defendants having profited in any manner by the acts for which they are to be held liable, and having in all matters of which complaint is made acted in entire good faith, I am of opinion that they should not be charged the full legal rate of interest and that the ends of justice will be subserved by charging them three per cent interest on the amount for which they are accountable.

## SUMMARY.

The net effect of the unauthorized failure to deduct the aforesaid losses and the unauthorized eliminations from capital, surplus and undivided profits was to overstate the amount of the management funds for the years in question in the aggregate amount, including interest to June 1, 1935, of $1,703,703.23, for which the directors of the company, as indicated above, should be held liable. This aggregate total and its component parts are summarized as follows:

### Eight Per Cent Elimination.

| | | |
|---|---:|---:|
| Amount of adjustment............... | $99,577 72 | |
| Plus interest at three per cent — Jan. | | |
| 1, 1928, to June 1, 1935........... | 22,156 03 | |
| | | $121,733 75 |

### Santa Clara, 1922.

| | | |
|---|---:|---:|
| Twenty per cent of loss.............. | $444,660 00 | |
| Plus interest at three per cent — Jan. | | |
| 1, 1923, to June 1, 1935........... | 165,635 85 | |
| | | 610,295 85 |

### Cuban Dominican, 1927.

| | | |
|---|---:|---:|
| Twenty per cent of loss.............. | $507,826 16 | |
| Plus interest at three per cent — Jan. | | |
| 1, 1928, to June 1, 1935........... | 112,991 32 | |
| | | 620,817 48 |

### Cuban Dominican, 1928.

| | | |
|---|---:|---:|
| Twenty per cent of loss.............. | $294,219 00 | |
| Plus interest at three per cent — Jan. | | |
| 1, 1929, to June 1, 1935........... | 56,637 15 | |
| | | 350,856 15 |
| | | $1,703,703 23 |

With respect to the management fund, therefore, such of the defendants as are hereinabove indicated should be held liable in the foregoing amounts in addition to the liability for $140,938.98, together with interest thereon already fixed by the opinion of the court.

I believe that in the foregoing report I have covered all matters referred to me and I herewith return my oath of office and the testimony and exhibits which I received from the court and the testimony and exhibits taken and received in evidence before me.

I am sending a copy of this report to each of the counsel for the parties.

The foregoing report was confirmed and approved by Mr. Justice Dore (N. Y. L. J. June 8, 1935, p. 2964).