The **HERALD COMPANY**, Plaintiff-
Appellee (Cross-Appellant),

v.

Donald R. **SEAWELL** et al., Defendants-
Appellants (Cross-Appellees).

Nos. 691–70, 692–70.

United States Court of Appeals,
Tenth Circuit.

Dec. 29, 1972.

Arthur J. Goldberg, New York City (Jay H. Topkis, Mark H. Alcott and Robert S. Smith of Paul, Weiss, Rifkind, Wharton & Garrison, New York City; William C. McClearn and Edwin S. Kahn of Holland & Hart, Denver, Colo., and Walter J. Predovich and Lester L. Ward, Jr., of Predovich & Ward, Pueblo, Colo., on the brief) for defendants-appellants.

Robert Swanson, Denver, Colo. (Fred E. Neef, Denver, Colo., on the brief). for plaintiff-appellee.

Before HILL, SETH and BARRETT, Circuit Judges.

HILL, Circuit Judge.

This is an appeal from a judgment in the District of Colorado, D.C., 315 F. Supp. 497, in a stockholders' derivative action. The suit was filed on behalf of the Denver Post, Inc., a Colorado newspaper publishing corporation, by the Herald Company, a New York corporation and a minority stockholder, seeking relief for the Denver Post corporation against its officers and directors for misconduct, breach of trust, and misuse of corporate assets.

There were 94,015 shares of capital stock of the Denver Post, Inc., outstanding in early 1960.[1] The corporate charter then provided for cumulative voting and for three directorships. These positions were held by E. Ray Campbell, also president and general counsel, Helen G. Bonfils, also secretary-treasurer, and E. Palmer Hoyt, also editor and publisher. The plaintiff corporation in this action is wholly owned, through other corporations, by Samuel I. Newhouse, owner of one of the nation's largest newspaper chains. Early in 1960, Newhouse set out to acquire at least an interest, and controlling interest if possible, in the Denver Post. May Bonfils Stanton, sister of Helen Bonfils, was the first to display an interest in selling her corporate shares in the Denver Post. On May 27, 1960, Newhouse purchased the Stanton stock, which amounted to 14,724 shares and which now constitutes 18% of the Denver Post outstanding stock, at $240 per share. On July 7, 1960, the Denver Post corporation purchased 19,574 shares of Denver Post stock held by the Denver U. S. National Bank as trustee for the Children's Hospital Association at $260 per share. This purchase was authorized by a unanimous vote of the corporate directors. The Children's Hospital stock was then carried on the balance sheet of the Denver Post as treasury stock.

Without doubt, the Post directors had for some years prior to acquisition of the Children's Hospital stock been considering the promulgation of some kind of a plan providing an opportunity for its employees to participate in the stock ownership of the Post. Such plans had been adopted by a number of corporations in the United States publishing large metropolitan newspapers. Palmer Hoyt became publisher of the Post in 1946, and soon thereafter began discussing the possibility of employee stock ownership with the directors and others in the Post organization. The consideration of such a plan continued throughout the 1950's and culminated in the actual creation of the Employees Stock Trust Plan in 1961. During this period, Hoyt and others personally investigated other employee stock ownership plans then in effect. Among the plans considered were those used by the Kansas City Star, the Cincinnati Inquirer and the Milwaukee Journal. As early as 1954, Hoyt went to Milwaukee a number of times to assess that plan, and it was eventually determined some form of the Milwaukee plan was best suited for the Post needs.

It is evident during this period of consideration the directors were fully aware of the many labor difficulties encountered by several of the large metropolitan daily newspapers of the country, including those encountered by Newhouse. The directors sincerely felt employee stock ownership would promote a better employer-employee relationship. It is equally true the directors knew employee stock ownership would eventually lock control of the corporation in the employees and eliminate the possibility of any outsider gaining stock control of the corporation.

By the time the Children's Hospital stock was purchased, the evidence is clear the directors had firmly determined to effectuate a plan for employee stock ownership. The contract of purchase expressly envisioned the use of that stock for the very purpose.[2]

1. By early 1960, the corporation's stock was held as follows:

| | |
|---|---|
| Helen G. Bonfils | 17,989 |
| Helen G. Bonfils Trust | 1,469 |
| Palmer Hoyt | 1 |
| E. Ray Campbell | 1 |
| F. G. Bonfils Trust | 17,514 |
| F. G. Bonfils Foundation | 5,029 |
| Tammen Trust | 17,705 |
| Children's Hospital Ass'n Trust | 19,574 |
| May Bonfils Stanton | 13,265 |
| Stanton Trust | 1,469 |
| Total | 94,015 |

(Holdings do not add to total because of rounding of fractional shares to the nearest whole number.)

2. Paragraph 2 of that contract provides in part: "The shares of stock of The Denver Post, Inc. subject to pledge to the Seller as security under the terms of

Upon the purchase of the Children's Hospital stock, the directors employed the law firm of Holland and Hart to further consider and to put into legal form an employees stock ownership plan. Mr. Hart personally visited the Milwaukee Journal to familiarize himself with that form of plan. By the fall of 1960, the Employees Stock Trust Plan was finalized for presentation to a special meeting of the Post stockholders. Notice of the meeting, as required by law, was sent out, and the meeting was held on November 30, 1961. The proposed plan was approved by all of the stock ownership except the 18% held by Newhouse. Shortly thereafter, the plan was formally adopted and put into legal effect by the directors.

Under the plan, the Post corporation sold its stock to the trust at a formula price based upon book value of the stock and the actual earnings by the corporation from year to year. In the hands of the trust, each share was broken down into ten trust units and thus sold to employees. In effect, this would enable an employee to invest in the stock in small amounts. At the outset, the directors transferred 1600 shares of the treasury stock to the trust and Bonfils donated 1600 shares of her personally owned stock to the trust, all for the purpose of resale by the trust to employees. Subsequent to these initial transfers, supplemental transfers and sales were made by the Post corporation of approximately 3400 shares from the treasury stock. As of December, 1969, 415 of the eligible 1159 employees had purchased shares from the trust. This involved investments amounting to nearly one million dollars and 8.3% of the total outstanding corporate stock. This employer-employee relations accomplishment was achieved in spite of the constant cloud of strife between Newhouse and the directors and the threats of litigation.

At this point in the recitation of the evidence generally, the participation of Newhouse and the plaintiff corporation in the affairs of the Post corporation has considerable significance. The plaintiff, The Herald Company, is a New York corporation and is wholly owned, through other corporations, by Samuel I. Newhouse. By 1960, Newhouse had accumulated a chain of about 15 metropolitan newspapers, at least five magazines, and at least 30 television stations. In addition, he owned a news-gathering-distribution service, was a large producer of newsprint, and was one of the largest printers of rotogravure newspaper supplements. In the latter field he was a competitor of one of the Post's operations.

At least as early as the first few months in 1960, Newhouse made connections in Denver for the purpose of exploring the possibility of acquiring at least a controlling interest in the Post corporation. Through a Denver lawyer, he acquired information pertaining to the corporate structure of the Post, the list of stockholders, and much other information pertinent to the internal affairs of the newspaper. As early as April, 1960, he made known his willingness to pay ten million dollars for a controlling interest in the paper. Within a short time, on May 27, 1960, through his Denver emissary he was able to consummate the purchase of the May Bonfils Stanton stock. The exhibits reflect nearly a constant flow of information from early 1960 to the date this suit was brought concerning the business affairs of the Post from the Denver attorney to Newhouse or to one of his agents in New

this Agreement may be released from time to time upon request of the Purchaser for *bona fide* sales at reasonable prices solely to officers and employees of The Denver Post, Inc., or to a trust or holding company for the benefit of such officers or employees, provided all proceeds received from such sale or sales are applied to the reduction of the principal amount of the indebtedness owing by Purchaser to Seller under the terms hereof; all such payments shall be in addition to the principal payments required to be made under the terms of this Agreement and shall be applied to reduce the last principal installments due and payable to Seller under the terms hereof."

York or Washington, D. C. Directions from Newhouse or one of his agents to the Denver attorney flowed freely during this entire period. As a proxy for the Newhouse stock, the Denver attorney appeared at all stockholder meetings. The February, 1970, pre-trial conference order filed in this case settles completely any question concerning knowledge on the part of Newhouse as to the very corporate acts complained about.

In that order, it was stipulated that Newhouse knew by July 11, 1960, the purchase price, installment payment and interest provisions of the contract for purchase of Children's Hospital stock; that in 1960 Newhouse's attorneys considered the legality of the stock purchase and urged him to challenge the transaction by court action as well as advised him to hire special counsel to investigate the sale; from 1961 Newhouse believed that the stock trust was designed to prevent his securing control; that it constituted an improper diversion of corporate assets; and, that it served no proper corporate purpose.

In his deposition, Newhouse frankly admitted that notwithstanding the recommendation of his attorney, Anderson, he decided not to take any action in 1960 or early 1961 in regard to the Children's Hospital stock purchase. "I was hoping that, if I didn't adopt a hostile attitude, if I was cooperative with them, at some point they would realize that I am not such a bad operator and I might be invited to the board."[3] There certainly can be no question about knowledge of Newhouse concerning the formation and adoption of the Employees Stock Trust plan. The evidence shows that he was advised at the time of the purchase of the Children's Hospital stock by the Post that the stock would probably be used for some kind of an employees benefit plan; he knew about the giving of the notice of the special stockholders meet-

ing, and a written memorandum was filed on his behalf with the Post corporation opposing the adoption of any such plan. His agents requested a postponement of the special meeting called for the purpose of approving the plan.

Before concluding our discussion generally of the evidence as disclosed by the record, we should elaborate upon the participation of Bonfils in the affairs of the Post corporation.

The Denver Post was founded during the latter part of the nineteenth century by F. G. Bonfils and H. H. Tammen. After their deaths, the ownership of the newspaper passed to their heirs, trusts established for the benefit of their heirs, family foundations, and to one local Denver institution, the Children's Hospital Association, as the beneficiary of a separate trust. As pointed out in defendants-appellants brief, "The Post's long tradition of local ownership has been personified by defendant Helen G. Bonfils, Denver civic leader and daughter of F. G. Bonfils, the newspaper's guiding spirit." For many years she was an officer and director of the Post corporation, and concluded her services with the Post as president and then chairman of the board.

At the factual inception of this controversy, Bonfils personally held about 18,000 shares of Post stock, and another 1,468 shares were held by the First National Bank of Kansas City as trustee under an indenture of trust executed by Bonfils in 1935. An additional 17,513 shares were jointly held by the First National Bank of Kansas City and the Denver U. S. National Bank as trustees under the will of Bonfils' father, Frederick G. Bonfils. This trust indenture named the F. G. Bonfils Foundation of Denver, a charitable trust, as the terminal beneficiary of this stock. Helen Bonfils was one of the trustees of the

---

3. We further quote from the pre-trial order:

Newhouse instructed his proxy Anderson to attend the June, 1961, stockholders meeting and state that he was not in conflict with the operation. Anderson at-

tended the meeting and made the statement. Anderson had warned Newhouse that the statement "would mean that we would be estopped from ever questioning the transactions whereby the corporation acquired the treasury stock."

F. G. Bonfils Foundation. In addition, this foundation held over 5,000 shares of Post stock outright.

One of the founders of the Post, H. H. Tammen, upon his death created the Tammen trust. Among the assets of that trust, as of 1960, were over 17,000 shares of stock in the Denver Post. Throughout this litigation, this stock has been referred to as the Rippey stock. With the passing of time, the Denver U. S. National Bank became trustee of this trust, and as such was the holder of the block of Rippey stock.

On June 7, 1966, the holders of three large blocks of stock, the Rippey stock held by the Denver U. S. National Bank as trustee, the Helen Bonfils stock personally owned by her, and the F. G. Bonfils stock trust with the Denver U. S. National Bank and the First National Bank of Kansas City as trustees, entered into a pooling or restrictive stock sale agreement. By this agreement, the three parties agreed not to sell any shares of Post stock held by them except to another party to the agreement, unless all parties agreed to sell all of the stock at the same terms and under the same conditions. Shortly thereafter, and on June 22, 1966, Bonfils purchased the Rippey stock from the trustee bank for $300 per share. The pooling agreement was thereby cancelled, and Bonfils agreed to indemnify the Denver U. S. National Bank for any liability that it might incur as a result of the sale of the stock. To firm up the purchase agreement, Bonfils borrowed $500,000 from the Denver Post corporation for the down payment on the purchase price of the stock. This money was repaid by Bonfils two days later, and after the commencement of litigation regarding that sale, she paid the interest for two days to the Post corporation.

The beneficiaries of the Tammen trust were dissatisfied with the sale of the stock, and on July 12, 1966, brought suit against the trustee, Bonfils, and the Denver Post to rescind the sale or, alternatively, to surcharge the trustee for failure to secure the best possible price for the block of stock. The litigation resulted in a surcharge judgment against the trustee in excess of 2.5 million dollars. In this litigation, the plaintiffs contended in part that the Post corporation and Bonfils unlawfully conspired with the trustee to injure the plaintiffs. On this issue, the trial judge concluded "[t]his evidence of a conspiracy does not rise higher than suspicious circumstances."

Over one-half of the total legal fees and expenses, or the amount of $96,000, was paid by the Post in the Rippey litigation. The payment of these fees and expenses by the Post corporation is one of the issues raised here as a part of the cross-appeal. In this regard, the trial court expressly found that the Post corporation was justified in the payment of attorney fees and expenses in the Rippey litigation.

Of some importance also is the fact that by the acquisition of the Rippey stock, Bonfils unquestionably acquired direct or indirect control of a majority interest in the Post. This control existed without regard to the disputed Children's Hospital stock transaction under attack in this suit.[4]

Immediately following the creation of the Employees Stock Trust, and at the time the 1,600 shares of treasury stock were sold and transferred by the directors of the Post to that trust, Bonfils contributed 1,600 shares of her personally owned Post stock to the trust. After acquiring the large block of Rippey stock,

4. At the time of the judgment below, the corporation's stock was held as follows:

| | | |
|---|---|---|
| Helen G. Bonfils | | 1 |
| Helen G. Bonfils Trust | | 1,468 |
| Helen G. Bonfils Foundation | | 34,093 |
| Palmer Hoyt | | 1 |
| Donald R. Seawell | | 1 |
| F. G. Bonfils Trust | | 17,514 |
| F. G. Bonfils Foundation | | 5,028 |
| The Herald Company | | 14,724 |
| Charles E. Stanton | | 10 |
| Denver Post Employees Stock Trust | | 6,616 |
| Post Treasury Stock | | 14,558 |
| | Total | 94,015 |

(Holdings do not add to total because of rounding of fractional shares.)

Bonfils entered into an agreement with the Helen G. Bonfils Foundation, thereby donating to the foundation all of her shares of Denver Post stock excepting one share. She retained the income from all of the donated stock for her lifetime, and also her right to vote the shares as long as she lived. In accordance with her agreement with the foundation, this donated stock will from time to time be sold by the foundation to the Employees Stock Trust at the same formula price theretofore determined. All proceeds received by the foundation from the sale of these shares to the Employees Stock Trust are to be used by the foundation for charitable purposes.

During the years 1966 and 1967, certain changes occurred in the internal affairs of the Denver Post corporation. E. Ray Campbell retired and resigned as president in 1966. His salary had been $21,000 per year, and Helen Bonfils had been paid $6,000 per year for her services as secretary-treasurer of the corporation. Upon the resignation of Campbell, Bonfils became president and Donald R. Seawell, Bonfils' personal attorney, became secretary-treasurer and replaced Campbell as a director of the corporation. Upon this change, the salaries of Bonfils and Seawell were fixed at $50,000 per year. About the same time, the existing charter provision for cumulative voting of stock was revoked by a special stockholders meeting. In 1967, Bonfils became seriously ill and was hospitalized; she thereafter remained in fragile health until her death during the pendency of this appeal. On December 7, 1967, the two directors Hoyt and Seawell held a meeting of the board, and increased the salaries of Bonfils and Seawell to $75,000 per year, retroactive to January 1, 1967.

After a lapse of over eight years from the date of the Children's Hospital stock purchase, and on July 29, 1968, this action was commenced. The Herald Company, a New York corporation and in whose name the Newhouse stock was eventually placed, appeared as plaintiff. In 1960, when Newhouse purchased the Stanton block of stock in the Post, those shares of stock were placed in the name of the Post Standard Company, which was a wholly owned subsidiary of the plaintiff, The Herald Company. In 1965, the Post Standard Company, as a corporation, was dissolved, and during the process of dissolution the block of stock was transferred to the parent company, The Herald Company. The named defendants in this action were Helen Bonfils; Palmer Hoyt; and Helen Bonfils, Charles R. Buxton, Stephen H. Hart, Palmer Hoyt, Warren K. Young, Joe W. Bruce, Barry Morrison, and Isadore M. Rosenblatt, as trustees of the Denver Post Employees Stock Trust; and The Denver Post, Inc., a Colorado corporation. Ray Campbell was originally named defendant in the lawsuit, but was dismissed out of the action by the trial judge prior to trial.

The gist of the action was that the defendants entered into a plan, scheme, design and conspiracy among themselves and with others to acquire sufficient shares of stock in the Post corporation so that voting control of the Post would be vested in Bonfils, her trust and foundation, or groups of persons under her domination and control and the control of some or all of the other defendants.

To support the conspiracy theory, it was contended that the defendants in furtherance of the conspiracy caused the following alleged overt acts to be committed:

The giving of a letter of retention and indemnity agreement by the Bonfils Foundation to the Bonfils Trust trustees, thereby inducing trustees to retain the Denver Post shares, thus preventing their sale and resulting in continued control in the defendants.

The entering into of a restricting agreement for ten years by the Denver U. S. National Bank as trustee for Children's Hospital stock, Bonfils, and Campbell and one Schultz as trustees of the Tammen trust, thus tying up the stock of all so that they would continue voting control of the Post.

The payment of over five million dollars by the Denver Post for the Children's Hospital stock, using half of its surplus to buy approximately 20% of its outstanding stock, thus locking such stock in the treasury of the Post, taking it out of circulation, and out of the reach of outside purchasers, thereby enabling defendants to maintain voting control of the Post.

The payment by the Post of $376,171 in interest on money borrowed to effectuate the above purchase.

The creation of an illusory stock trust to which they transferred stock purchased by the Post at a price of $260 per share to the stock trust at a formula price beginning at $130 per share, and continuing since 1961 to sell such shares to the stock trust at formula prices and charging of the loss thereon to the Post's surplus.

The entering into a pooling agreement by Denver U. S. National Bank, Bonfils, and the trustees of the F. G. Bonfils Trust, thereby agreeing not to sell the Rippey stock without the consent of all; the selling of the Rippey stock to Bonfils; the use of Post money to make the down payment on the sale; and the utilization of an indemnity agreement to induce the Denver U. S. National Bank to make such sale and not to seek out other bids; the defense of the surcharge action against the Denver U. S. National Bank by the Post Corporation; the giving of a further indemnity agreement by Bonfils to the Denver U. S. National Bank to cover its legal expenses; and the payment of the surcharge judgment by Bonfils to protect her title to the Rippey stock.

The defense of the Rippey court action by the Post despite its nominal interest therein, and the payment of $96,000 of attorney fees to the joint attorneys of Bonfils and the Post.

The repeal of the cumulative voting provision in order to perpetuate their own control of the Post.

The payment of excessive salaries to the corporate officers by the Post.

The payment of legal fees and expenses of the defendants and in defending this action by the Post prior to any vindication of their alleged wrongdoings.

In the trial court and here, the defendants-appellants have urged as defenses to the action:

The purchase of the Children's Hospital stock, the establishment of the employees trust and the accommodation loan in connection with Rippey transactions were lawful under applicable statutes; that these transactions have not damaged the corporation, instead each has served a proper and beneficial purpose to the Post. The essential purpose of these transactions, they say, was to benefit the corporation by providing an opportunity for its employees to participate in its ownership, thus maintaining the stability of employee relations, employee work quality, and increasing employees' morale.

The employees trust is a recognized form of employee incentive, and that the actions in connection therewith were within the scope of permissible business judgment exercised by the corporation's directors.

The elimination of cumulative voting was lawful under the statutes, and did not damage the corporation.

The challenged transactions did not benefit the individual defendants and were in fact accomplished at substantial financial sacrifice by Bonfils.

That Newhouse is the sole owner of the largest newspaper chain in the United States, and his purpose, commencing in 1960 and continuing to date, has been to acquire by whatever means necessary, sufficient stock to give him control of the Post.

The directors believed that a Newhouse takeover would be detrimental to important corporate policies and traditions. That the suit is not brought in good faith or for the benefit of the corporation, and may not be maintained as a derivative suit.

Because plaintiff did not acquire its stock until 1965, it is without standing

to assert the first three claims of the complaint; that these claims were barred by the statute of limitations. That Newhouse and plaintiff corporation are barred from asserting the major claims by the doctrine of laches, waiver, acquiescence, ratification and estoppel; that Newhouse had, with knowledge of every material fact, acquiesced in the significant corporate transactions in issue and consciously permitted the Post to go ahead for periods of up to eight years with the transactions now complained about, knowing the continuing action in reliance on and the implementation of these transactions by these defendants and over 400 Post employees.

The salaries paid to the officers were proper corporate expenses and within the range of reasonable business judgment delegated by law to a corporation director.

Prior to the trial of the case, the plaintiff filed a supplement to the complaint to include an attack upon the Post directors' part payment of attorneys fees incurred by the Post corporation for the defense of this suit.

Trial of the case upon its merits was had, and at the conclusion of that trial the judge made exhaustive oral findings of fact from the bench. By a very comprehensive pre-trial order, many of the facts had also been agreed upon by counsel. The basic facts, as we have set them out above, are mostly without question, and the factual issues on review here are chiefly conclusionary facts and inferences made by the trial judge. Subsequent to the making of the oral findings of fact, and on August 10, 1970, the trial judge filed a memorandum decision in which he incorporated the previously made oral findings of fact.

In the decision, the court fashioned the remedy deemed appropriate under the facts. At the time the trial judge made his oral findings, he expressed his intention to "leave the stock plan in its present form" but to provide a method to compensate the corporation for the loss on the treasury shares transferred to the stock trust. In the memorandum

opinion, a much more drastic remedy was provided in that the more than 14,000 shares remaining in the treasury from the Children's Hospital purchase, the 776 shares transferred to the stock trust after the plaintiff challenged in writing the trust arrangement, and 290 additional shares transferred to the stock trust which were beneficially owned by the defendants Hoyt, Buxton and Young, were ordered sold at public auction. The remedy also included a provision that in the event the auction sale failed to yield a price of $413 a share, representing the purchase price of the stock plus interest from 1960, the court retained jurisdiction to impose a surcharge on Bonfils and Hoyt in the amount of such difference. The court at that time dismissed four counts of the complaint. These counts involved the elimination of cumulative voting by stockholders; the two-day loan to Bonfils which she used to make the down payment on the Rippey stock; the corporation's payment of attorney fees in the Rippey litigation; and the corporation's payment of interest on money borrowed to finance the acquisition of the Children's Hospital stock. The court rejected nearly all claims involving salaries and expenses of management, although it found that the retroactive salary increases given to Seawell and Bonfils in 1967 were improper. The decree surcharged Hoyt and Bonfils for 80% of the counsel fees and expenses paid by the Denver Post for all of the defendants in this litigation, and, finally, awarded attorney fees and expenses of $300,000 to plaintiff's counsel.

In our approach to all the issues decided by this opinion, it is important to set out our conception of the law concerning the obligations and duties of directors and managing officers of a corporation publishing a newspaper such as the Denver Post. It is in this area of the law where we first disagree with the trial court.

Apparent from the findings of fact and conclusions of law, the trial judge determined the first and primary obligation of such corporate officers to be

the making of profit for the stockholders of the corporation. In the court's opinion, the duty to return a profit to the shareholders is emphasized and re-emphasized.

■ We are fully cognizant of the well established corporate rule of law which places corporate officers and directors in the position of fiduciaries for the stockholders. Basic in that rule of law is the profit motive of the corporate entity. In this case we have a corporation engaged chiefly in the publication of a large metropolitan newspaper, whose obligation and duty is something more than the making of corporate profits. Its obligation is threefold: to the stockholders, to the employees, and to the public.[5]

Crucial to the decision of the trial judge is his adoption, in effect, of the theory underlying the cause of action. To support that theory, the plaintiff-appellee contended a conspiracy, scheme, plan, and design was entered into by Hoyt, Bonfils and others to effectuate their purpose of locking the stock control of the Post corporation in such a manner as to prevent Newhouse or any other person from gaining control of the Post corporation and thus perpetuating corporate control in the so-called incumbent group. In the conclusions of law, the trial judge fell short of determining that the acquisition of the Children's Hospital stock or the subsequent transfer of shares of that stock to the Employees Stock Trust was actually unlawful and illegal.[6]

■ We will first examine the legality of the two transactions most vigorously attacked in this lawsuit. The Colorado statutes, 1963 C.R.S. 31–2–2 (1),[7] expressly authorize a corporation to purchase its own stock "to the extent of unreserved and unrestricted surplus." Under this statute, it follows that such stock when purchased shall be held as treasury stock by the corporation until disposed of in some manner. So without question, the directors of the Post corporation had statutory au-

---

5. *See* Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367 (1934); American Rolling Mill Co. v. Commissioner, 41 F.2d 314 (6th Cir. 1930); Armstrong Cork Co. v. H. A. Meldrum Co., 285 F. 58 (W.D.N.Y.1922); Miami v. Florida Pub. Serv. Comm'n, 208 So.2d 249 (Fla.1968); United Transit Co. v. Nunes, 99 R.I. 501, 209 A.2d 215 (1965); A. P. Smith Mfg. Co. v. Barlow, 13 N.J. 145, 98 A.2d 581 (1953); appeal dismissed, 346 U.S. 861, 74 S.Ct. 107, 98 L.Ed. 373; State ex rel. Sorensen v. Chicago, B. & Q. R. Co., 112 Neb. 248, 199 N.W. 534 (1924); Huntington Brewing Co. v. McGrew, 64 Ind.App. 273, 112 N.E. 534 (1916).

It should be noted that every state in the Union authorizes by statute corporate contributions for various purposes.

*See also* Dodd, For Whom Are Corporate Managers Trustees?, 45 Harv.L.Rev. 1145 (1932), and discussion there of views of Owen D. Young and Gerard T. Swope, Sr., two outstanding American business executives of this century.

For an illuminating survey of the development of corporate responsibility, see Blumberg, Corporate Responsibility and the Social Crisis, 50 Boston U.L.Rev. 157 (1970).

6. The trial court found:

The question of whether any step in the execution of these plans and objectives could be justified is not material. It may well be that the acquisition of stock for an overriding purpose in the interest of the corporation could be justified. It may be that the transfer of stock to an employees' trust fund for employee morale and other reasons could be justified. It may be that the preclusion of new stock ownership where the essential welfare or survival of the corporation is threatened could be justified.

But, here we have a package, one step after another, which is continuing with reference to the Children's Hospital stock, the utilization of the trust organization, and the continuing accretions to stock ownership, that I just simply do not think can be justified, considered as a package.

7. 1963 C.R.S. 31–2–2(1) A corporation shall have the right to purchase, take, receive or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares, but purchases of its own shares, whether direct or indirect, shall be made only to the extent of unreserved and unrestricted surplus.

thority to purchase the Children's Hospital stock.[8]

■ There are other facets of the transaction attacked. First, the motive of the directors in purchasing the stock. Conceding for the sake of argument that the directors purchased the stock to prevent it from being sold to Newhouse or his group, we find nothing bad or sinister in the directors' having such a motive.[9] In fact, we find that motive no more sinister than the desire of Newhouse to gain control of the Post corporation. In this area of the trial judge's findings, he stated and found "[t]he Post management believed that it would be inimical to the best interests of the Post for Newhouse to obtain control." The court further expressly found: "I do not think there was anything sinister about preserving it as a Bonfils corporation or in the Bonfils image, because indeed, as I have indicated, a great newspaper had been developed, but nonetheless, the fact further illustrates the dominant and controlling objective with regard to utilization of the funds of the corporation in connection with the trust transaction."

On the question of motive, the trial court made other pertinent and important findings of fact. The directors knew about Newhouse's purchase of control of more than a dozen newspapers. They feared that a Newhouse take over would have an adverse impact on the character and quality of the Post. They believed local independent ownership preferable to chain ownership, particularly if that local independent ownership was in the image and tradition of the Bonfils history and development, history of the Denver Post. They believed Newhouse newspapers to be inferior to

the Post as a general proposition. They believed and indeed Newhouse had a reputation among his employees of having poor relations with employees of his newspapers. They knew that the employees of the Post knew that Newhouse newspapers had considerable labor difficulties, and if Newhouse acquired control of the Post, bad labor relations would result. They knew that control by Newhouse would certainly not represent local control as his primary interests were elsewhere.

■ An important facet in the attack upon the purchase by the Post directors of the Children's Hospital stock is the price paid, $260 per share. The trial judge laid stress upon this purchase price and considered it exorbitant. In his findings, he found the stock to be worth $130 per share at the date of purchase. In view of all the evidence in the case which we have very carefully reviewed, we must conclude this finding of fact to be clearly erroneous. The $130 value may very well reflect the book value of the stock, but it does not reflect the market value. The Post stock was not listed, most of it was held in large blocks, there was no over-the-counter trading of the stock, and the ownership was not widely distributed. It is conceded the Post stock was not being traded for investment purposes, and the only opportunity for sale was for purposes of control or participation in the newspaper business. At the time of the purchase of the Children's Hospital stock, the only recent sale of Post stock was the Newhouse purchase of the Stanton stock in a large block just a few days prior at the price of $240 per share. In determining the value of the Post stock, we agree with the statement

---

8. On this point, the trial judge found:
   The Court finds that the stock was purchased out of surplus, and while there is some claim that the funds utilized embarrassed the corporation, I find no substantial evidence to support the idea that the corporation was handicapped in its immediate plans or operations by utilizing that part of the surplus, although it is impossible to know in a broad and far-

reaching sense just what effect the tying up of that capital would have.

9. McPhail v. L. S. Starrett Co., 257 F.2d 388 (1st Cir. 1958) ; Hendricks v. Mill Eng'r & Supply Co., 68 Wash.2d 490, 413 P.2d 811 (1966); Cheff v. Mathes, 41 Del.Ch. 494, 199 A.2d 548 (1964); Kors v. Carey, 39 Del.Ch. 47, 158 A.2d 136 (1960).

of Judge Doyle on the issue of value in another Denver Post stock case, Rippey v. Denver United States National Bank, 273 F.Supp. 718, 732 (D.Colo.1967): "Actual testing of the market was the only means of determining price in these circumstances." The same circumstances regarding the struggle for control existed in the Rippey case as we have here; only the years differ.

Newhouse, in his testimony in this case, testified at length about the value of Denver Post stock, both as of the date of his purchase of the Stanton stock in 1960 and through the next few years, up to the date his testimony was given. He testified that the $240 per share price he paid for the Stanton stock was considerably below the full value of the stock; his agent was trying to buy it as cheaply as he could, but Newhouse would have paid $300 a share or a higher price; he was sure the property was worth a great deal more than the price he paid Stanton, and she knew it at the time, which was the reason she asked him to agree to pay an additional price for her stock if he paid someone else a higher price; and that at the date of the taking of his deposition in this case, Post stock was worth a minimum of $500 a share and that he would be willing to pay that and probably somewhat more. In the Rippey case, supra, Judge Doyle found Post stock to be worth $450 per share as of 1966, and the record here does not show any substantial change in the financial position of the Denver Post between 1960 and 1966. The comptroller of the Denver Post testified that in his opinion the $260 per share price was very reasonable. The comptroller pointed out that if the Post had not purchased the Children's Hospital stock, for the period of time between the purchase and the date of the comptroller's testimony the corporation would have paid out over a million dollars in dividends on this stock.

We now pass to the question of the legality of the creation of the Employee Stock Trust plan and the implementation of that plan by the sale of treasury stock to the trustees of the Employees Stock Trust for the resale of such stock to the employees.

Under Colorado statutory law,[10] a corporation has express authority to establish "stock bonus plans, stock option plans and other incentive plans . . ." for the benefit of the employees of the corporation. It should be also noted that the Colorado Corporation Code, 1963 C.R.S. 31–4–4(3), authorizes the directors of a corporation to sell or dispose of treasury stock for a consideration fixed by the board of directors.[11] Much is made of the particular provisions and intended effect of the Employees Stock Trust plan adopted by the stockholders and directors of the Post. We place little importance on these provisions, because our chief concern at this point is the legality of such a plan. The adoption and implementation of such a plan was clearly within the power and authority granted by statute to the corporation. In addition, we find nothing in the statute that would prohibit any of the provisions embodied in this plan. The particular provisions of any such plan, as we later point out, would generally be left to the business judgment of the directors and stockholders of the corporation, as was done in this case.[12] The facts in this case undisputedly show benefits to the employees from the plan.

10. 1963 C.R.S. 31–2–1(16) To pay pensions and establish pension plans, pension trusts, profit-sharing plans, stock bonus plans, stock option plans and other incentive plans and to provide medical service, life, sickness, accident, disability or unemployment insurance, education, housing, social and recreational services, and other similar aids and services for all or any of the directors, officers and employees of the corporation, or of any subsidiary thereof, wholly or partly at the expense of the corporation;

11. 1963 C.R.S. 31–4–4(3) Treasury shares may be disposed of by the corporation for such consideration expressed in dollars as may be fixed from time to time by the board of directors.

12. *Cf.* Mountain States Packing Co. v. Curtis, 86 Colo. 355, 281 P. 737 (1929).

Employees have invested nearly a million dollars of their savings in the stock trust and have received nearly a quarter of a million dollars in dividends. These benefits have accrued in spite of the Post stock controversy and litigation, and in reliance upon the permanency of the stock trust plan itself.

At the inception of the plan, all stockholders other than Newhouse, or holders of 82% of the stock, approved the creation of the plan; supplements 1 and 2 to the stock plan were approved at stockholders meetings without any opposition, even from Newhouse; and all stockholders other than Newhouse approved supplements 3 and 4. Supplements 1, 2 and 3 provided for the transfer of additional shares of the corporation's treasury stock to the Employees Stock Trust at the formula price; and supplement 4 was adopted to enable employees of the corporation's West Coast rotogravure plant to participate.

It is undisputed here that the treasury stock used by the Post corporation to implement the Employees Stock Trust plan was purchased by the corporation at a price of $260 per share. This stock has been transferred by the corporation to the stock trust at a formula price of $130 a share. Plaintiff-appellee and the trial judge have placed undue importance upon the fact that the corporation had a substantial financial loss in its transfer of the treasury stock to the Employees Stock Trust. It is true, the corporation did take a substantial loss on each share transferred; but the above cited statute, as set out in the footnote, anticipates and authorizes a corporation to create such plans "wholly or partly at the expense of the corporation." [13]

The statutory powers of a corporation in Colorado are specifically enumerated.[14] In addition to the statutory powers and duties of officers and directors of a corporation, they are in a broad sense agents of the corporation. They occupy a quasi-fiduciary relation to the corporation and to its stockholders. They must manage the corporate affairs in good faith, within the limits of the law applicable,[15] and give the corporate entity the benefit of their best judgment and care. Within the limits of their legal authority, officers and directors of a corporation, by necessity, possess a large amount of discretionary power. That power, if exercised honestly and with reason, is not subject to control by either the stockholders or the courts.[16] The officers and directors of a corporation are, at least, presumed to represent the will of a majority of the stockholders. When stockholders simply become dissatisfied with corporate management, ordinarily the remedy is to install new management by the election of new directors.

Basic in many of the rules of law pertaining to the relationship between officers and directors of a corporation and the corporate stockholders is the motive of profit for the corporation. A corporation publishing a newspaper such as the Denver Post certainly has other obligations besides the making of profit. It has an obligation to the public, that is, the thousands of people who buy the paper, read it, and rely upon

---

13. The law appears generally to be that if there is a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted, the employee stock purchase plan is valid. Olson Bros., Inc. v. Englehart, 211 A.2d 610 (Del.Ch.1965); aff'd, 245 A.2d 166 (Del.1968); Eliasberg v. Standard Oil Co., 23 N.J.Super. 431, 92 A.2d 862 (1952), aff'd without opinion, 12 N.J. 467, 97 A.2d 437 (1953).

14. 1963 C.R.S. 31–2–1.

15. 1963 C.R.S. 31–5–1 The business and affairs of a corporation shall be managed by a board of directors which shall exercise all the powers of the corporation, except as otherwise provided in this code or by its articles of incorporation. . . . The board of directors shall have the authority to fix the compensation of directors, unless otherwise provided in the articles of incorporation.

16. Templeman v. Grant, 75 Colo. 519, 227 P. 555 (1924).

its contents.[17] Such a newspaper is endowed with an important public interest. It must adhere to the ethics of the great profession of journalism. The readers are entitled to a high quality of accurate news coverage of local, state, national, and international events. The newspaper management has an obligation to assume leadership, when needed, for the betterment of the area served by the newspaper. Because of these relations with the public, a corporation publishing a great newspaper such as the Denver Post is, in effect, a quasi-public institution.

Such a newspaper corporation, not unlike some other corporations, also has an obligation to those people who make its daily publication possible.[18] A great number of the employees are either members of a profession or highly skilled and specialized in their crafts. Many of them have dedicated their lives to this one endeavor. The appellants' sincere interest in their employees also refutes the allegation of illegal design. The Post's concern for their employees is exemplified in all the employee benefits provided. For instance, the employees are given, inter alia, hospitalization insurance, medical insurance, and retirement pensions. Indeed, approximately 11% of the Post's total expenses go for these employee benefits. With the implementation of the Employees Stock Trust, employees also will be allowed eventually to own the Post. Since, prior to institution of legal proceedings in 1968, the Post Employees Stock Trust was following an almost identical course as had occurred in the Milwaukee plan, it can generally be said that within 35 years Post employees should own 85 to 90% of the paper.

The facts show appellants' motive for implementing the Employees Stock Trust was to benefit the public, the corporation and the employees. Any

contrary finding under the law and the evidence is clearly erroneous. Indeed, appellants' conduct was quite in harmony with that encouraged under Colorado law. The testimony indicates no hardship was imposed upon the Post by this stock acquisition, and the result was a savings in dividends of over $1,007,661 in non-deductible dividends. If the Post had invested the five million dollars it paid for the Children's stock in some other investment, the Post would not have made as much money after taxes as it saved by purchasing the stock.

Derivative suits attacking corporate expenditures for employee benefits are not new. During the late 1800's stockholders were attacking corporate acts benefitting employees. In the famous case of Steinway v. Steinway & Sons, 17 Misc. 43, 40 N.Y.S. 718 (Sup.Ct. 1896), the corporation, following plant relocation, constructed new homes and contributed to a church, school, free library and free baths for employees. The court upheld this contribution of corporate assets on the ground that such activities provided for better labor relations and contributed materially to the corporation's resources.[19] Corporate expenditures for the establishment of a tubercular hospital for employees were upheld along with expenditures for pensions, vacations and other benefits on grounds that such measures were necessary to "get competent and effective service." People ex rel. Metropolitan Life Ins. Co. v. Hotchkiss, 136 App.Div. 150, 120 N.Y.S. 649, 651 (1909).

Other forms of employee benefit plans have systematically developed. Bonus and incentive compensation policies are prevalent in many corporations today. Although these policies have on occasion been attacked by minority stockholders, they generally have been upheld as incentive measures to produce results. Diamond v. Davis, 62 N.Y.S.2d 181

17. *Cf.* A. P. Smith Mfg. Co. v. Barlow, supra.

18. *Cf.* Gallin v. Nat'l City Bank, 152 Misc. 679, 273 N.Y.S. 87 (1934), 155 Misc. 880, 281 N.Y.S. 795 (1935).

19. *See also* State ex inf. Gentry v. Long-Bell Lumber Co., 321 Mo. 461, 12 S.W. 2d 64 (1928); Wachovia Bank & Trust Co. v. Steele's Mills, 225 N.C. 302, 34 S.E.2d 425 (1945).

(1945). Corporations through their directors may pay employees extra compensation in the way of a bonus, and if properly authorized it is not a fraud upon dissenting stockholders. Spaeth v. Journal Printing Company, 139 F.Supp. 188 (D.C.Alas.1956). Nor is extra compensation against public policy. *See* De Pova v. Camden Forge Co., 254 F.2d 248 (3d Cir. 1958); 1963 C.R.S. 31–2–1 (16). As one court emphasized:[20]

> We have long since passed the stage in which stockholders, who merely invest capital and leave it wholly to management to make it fruitful, can make absolutely exclusive claim to all profits against those whose labor, skill, ability, judgment, and effort have made profits available.

When the board of directors and a substantial majority of stockholders have approved a stock option plan, the court will not impose its business judgment on those responsible for corporate management unless the facts are far more compelling than in the instant case. 5 Fletcher Cyc. Corp. § 2143.1 (perm. ed. 1967). Appellee has failed to show the unreasonableness of this stock plan. The testimony indicates at least four benefits are deriving from the trust: (1) the employees now have greater pride in their work since they own part of the Post; (2) employee turnover has been reduced in all phases of operation; (3) the trust has pinned down several of the Post's key personnel in the younger age bracket who have been approached by other newspapers; and (4) it has helped materially in production and in labor relations. Reduction in employee turnover and increased loyalty could reasonably be expected from the stock trust. This court should not substitute its business judgment for that of the Post directors under the existing situation. McPhail v. L. S. Starrett Co., 257 F.2d 388 (1st Cir. 1958).

Therefore the court must conclude as a matter of law that the so-called wrongful acts on the part of the officers and directors of the Post corporation which constituted the legal basis for this action were in fact not legal wrongs. The purchase of the Children's Hospital stock, the creation of the Employees Stock Trust plan, and the implementation of that plan were clearly within the purview of the statutory law of Colorado.

The trial court, in connection with these so-called wrongful acts, placed stress upon the motives of the officers and directors in performing the acts complained of. The findings of the trial court relative to the motive of the officers and directors is a conclusionary finding of fact, and is wholly unsupported by the basic facts found by the court. This has been demonstrated by our general discussion set forth above of the findings of basic facts made by the trial court. We have heretofore discussed in part the issue of motive in connection with other issues. A further brief discussion of the undisputed facts as to motive is appropriate at this time.

Appellee and the trial court would have us view the officers and directors as selfish individuals desirous of perpetuating and maintaining control of the Post in themselves. A review of the makeup of the board of directors of the Post completely refutes this motive argument. Bonfils, Hoyt and Campbell constituted the board of directors during most of the time in question. Of the three, Campbell retired before institution of these legal proceedings, and Hoyt retired shortly after the trial of this case in 1970. Both retired because of age, and upon retirement they lost all control of the corporation. Bonfils, who was older than either Hoyt or Campbell, certainly had no lengthy expectancy of life. Before this suit was filed, Bonfils had donated all except one share of her Post stock to the Helen G. Bonfils Foundation, and at the time of trial was over 80 years of age. She was well known and revered among the people of Denver and the State of Colorado for

---

20. Gallin v. National City Bank, supra.

her interest in community charities and affairs.

There is no question but the Children's Hospital stock was purchased primarily to benefit the employees; this benefit eventually gave a monetary gain to the shareholders. As we have pointed out, shortly after Hoyt joined the Post staff in 1946, he immediately began discussing with the other directors employee ownership of Post stock. The evidence is undisputed that at the time of the purchase of the Children's Hospital stock, the creation of the Employees Stock Trust was beyond the discussion stage and was actually in the process of formulation. At the time Newhouse entered the picture, the Employees Stock Trust plan was well on its way to formulation. The only thing left in that connection was the implementation of the plan.

Appellee urges in support of the bad motive argument that the Post, rather than borrowing money to purchase outstanding stock as it did, should have issued new stock for the purpose of implementing the Employees Stock Trust plan. A prominent and reputable Denver law firm had been employed to look into the available methods of implementing the Employees Stock Trust plan, and that law firm advised the directors against issuing new stock. That law firm was of the opinion that the issuance of new stock was not as sound financially as purchasing already existing stock.

From our view of the evidence in the case, we find no evidence to prove the directors' ultimate purpose was to maintain control of the Post in themselves. To us it is significant that Newhouse, in his attempt to gain control, had promised to retain Hoyt as publisher for life at his present salary. Newhouse also promised Hoyt that he could hire his own staff members, give them life jobs, and even hire some members of his own family. Seawell, who replaced Campbell on the board of directors, was also promised a lifetime job by Newhouse if the control of the Post was delivered to him. If these Post policymakers craved personal power, surely Newhouse's job offers were just as attractive to Hoyt and Seawell from the standpoint of personal power and control as the purchase of the Children's Hospital stock and implementation of the stock trust plan. All of the directors certainly knew and realized that any power or control they possessed or acquired over the Post would be eventually terminated by either retirement or death.

It is undisputed by the basic facts in the record that the directors' motive for the purchase of the Children's Hospital stock was not limited to the welfare of stockholders and employees; it was also a sincere desire to keep the Post as a newspaper responsive to public needs. Testimony is undisputed also that the Post could have made more profit if it had cut down on the quality of its newspaper product, eliminated some of the editorial employees, and ceased promotion of many programs the directors sincerely felt were beneficial to the public in the geographic region the newspaper served. The evidence shows in the area of editorial policy, the Post ranks fourth nationally in amount of editorial space provided in its newspapers, and it ranks first in the evening field. These are only a few examples of the officers' and directors' placing the public needs and good above the desire for profit, and, as we have indicated, are wholly justified.

In addition to the reasons heretofore expressed compelling the reversal of the case, we deem it appropriate to discuss some additional legal defenses relied upon by appellants which also lead to our decision to reverse. As affirmative defenses, appellants pleaded and relied upon the statute of limitations, laches, and acquiescence. Under the law and the facts disclosed by the record, we are convinced that each of these affirmative defenses is applicable to this case, and if a good cause of action did exist in an attack upon the two transactions in question, each of these defenses would bar recovery.

Under the reasoning of the trial court, the application of all of these affirmative defenses was rejected because of the conclusionary findings of conspiracy, concealment, failure to disclose, and the continuing wrong theory.[21] Also in the trial court's memorandum decision filed on August 10, 1970, with reference to the application of these affirmative defenses, the court again rejected such defenses.[22]

The continuing wrong theory resorted to by the trial judge to prevent the running of a statute of limitations evolved to serve an entirely different legal purpose than its use by the trial judge here. The theory evolved as a device to combat the equity requirement, which later became a specific requirement contained in the federal rules, concerning the necessity of contemporaneous ownership of corporate stock as a prerequisite for the bringing of a derivative action. The theory was not intended to be a device for the tolling of the statute of limitations or as a bar to the other affirmative defenses raised here. Professor Wright has commented, "The federal courts generally have rejected the contention that the entire series of events constitutes a single transaction—the so-called continuous wrong notion—entitling a plaintiff to bring suit for injury suffered by the corporation subsequent to plaintiff's acquisition of stock."[23] In addition, as we have heretofore indicated, the acts relied upon for the application of the continuing wrong theory were not corporate wrongs, and the theory could not possibly apply in this case. The same may be said about the court's rejection of the affirmative defenses because of the existence of a conspiracy or an unlawful scheme or design. There is no factual basis to support either the factual or legal conclusions of the trial court in this regard.

Under Colorado law, there are three statutes of limitation possibly applicable to this case; the one applicable is dependent on how this particular action is categorized. The first statute, 1963 C.R.S. 87-1-10, provides a three-year limitation in fraud actions with the statute commencing to run upon the discovery of fraud by the aggrieved party. Another, 1963 C.R.S. 87-1-15, provides a five-year limitation for suits challenging abuse of trust and for all other suits formerly in equity and not otherwise provided for. The third, 1963 C.R.S. 87-1-9, provides a three-year limitation upon actions at law based on implied or constructive fraud and for all other actions at law of every kind for which no other limitation is provided.[24]

In a derivative suit, no recovery can be had when a state statute of limitations would have barred recovery had the case been instituted in the state

---

21. In a broad statement contained in the oral findings and conclusions, the trial judge stated:

    From various standpoints, concealment, failure to disclose on the part of fiduciaries and trustees, continuing wrong, the position of the corporation itself rather than the position of the stockholder as such being involved, and from other equitable considerations, relief should not be barred.

22. No principle of laches, *limitations*, estoppel or unclean hands on the part of a plaintiff *stockholder* in this derivative action should limit or bar corporate relief as against officers and directors who at all times have remained in domination and control, who have formed and carried out, through mismanagement and concealment, a plan to gain, maintain and perpetuate themselves in voting control through the use of corporate funds, and where the plan continues to operate to inflict damage. (Emphasis added).

23. 7A Wright & Miller, Federal Practice and Procedure: Civil § 1828 at 346.

24. These statutes of limitation begin to run "when the defrauded person has knowledge of the facts which in the exercise of proper prudence and diligence would enable him to discover the fraud perpetrated against him." Greco v. Pullara, 166 Colo. 465, 444 P.2d 383, 384 (1968); Hall v. Swan, 117 Colo. 349, 188 P.2d 437 (1947). In a stockholder's derivative suit, it is the knowledge of the plaintiff stockholder that starts the statute running. deHaas v. Empire Petroleum Co., 435 F. 2d 1223 (10th Cir. 1970).

courts.[25] Regardless of how this case may be categorized, be it in law or equity, under implied or constructive fraud, or in trust or fiduciary relations, the action is barred by one of the three Colorado statutes set out above limiting the period of time for the bringing of actions; and we have found no other applicable Colorado law to convince us that these statutes of limitations may be tolled under the facts as disclosed by the evidence in this case. We find no legal obstacle to prevent the statute of limitations from running in this case and from barring appellee's attack on the Children's Hospital stock purchase and the creation of the Employees Stock Trust plan.

■ Under Colorado law, a stockholder with knowledge of material facts and who has consented or acquiesced in a transaction about which he complains ordinarily cannot attack the transaction on behalf of the corporation.[26] Nor may that stockholder bring such an action unless he acts promptly.[27] The undisputed evidence shows conclusively that Newhouse knew from the very beginning what was taking place insofar as the operation of the Post corporation was concerned. He had such knowledge prior to purchase of the Children's Hospital stock concerning the intentions of the officers and directors. He knew the price they would have to pay for the stock. He made no effort to stop the transaction. In fact, the evidence shows he intentionally refrained from disclosing his views concerning the purchase of the stock. When his attorneys drafted a letter to the stockholders attacking the stock purchase, Newhouse deleted those allegations from the final draft; when the stock purchase was formally reported to the stockholders meeting in June, 1961, a representative of Newhouse stated that Newhouse was "not in conflict with the operations." Although Newhouse's proxy was present at the stockholders meetings when supplements 1 and 2 to the stock trust were considered and voted upon, the proxy did not make any objection. At the stockholders meeting voting on supplement 3 in 1966, Newhouse's proxy stated in substance that Newhouse favored the plan, but was voting against the supplement.

■ Acquiescence is a doctrine springing from the rule that he who seeks equity must do equity. Acquiescence and laches are not correlative terms because they relate to different times within the same spectrum. "Laches" relates to delay after the act is done, while "acquiescence" relates to inaction during the time the act is being performed.[28] Laches implies passive assent while acquiescence imports active assent.[29] The evidence clearly shows acquiescence on the part of Newhouse to both of the transactions complained about. If it could be concluded that any wrong was committed by either of the transactions, the evidence also strongly shows the laches and passive assent on the part of Newhouse.

■ Appellee argues that laches may not apply because three elements must be met as legal requirements before the doctrine may be applied. Briefly stated, these elements are (1) full knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another.[30] From what we have already said, there can be no question about meeting the first two requirements. As to the third requirement of reliance and prejudice, the evidence shows during the eight years between the purchase of the stock and the bringing of this suit, many changes oc-

25. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

26. Swafford v. Berry, 152 Colo. 493, 382 P.2d 999 (1963).

27. Holmes v. Jewett, 55 Colo. 187, 134 P. 665 (1913).

28. Bay Newfoundland Co. v. Wilson & Co., 24 Del.Ch. 30, 4 A.2d 668 (1939).

29. Lux v. Haggin, 69 Cal. 255, 10 P. 674 (1886).

30. Federal Home Loan Bank Bd. v. Elliott, 386 F.2d 42 (9th Cir. 1967), cert. denied, 390 U.S. 1011, 88 S.Ct. 1260, 20 L. Ed.2d 161 (1968).

curred in connection with the Post corporation. The Employees Stock Trust plan was supplemented three times; Bonfils made donations of stock to the trust and created a foundation with the sole purpose of eventually transferring all of her stock from the foundation to the stock trust; and numerous employees invested their money in Post stock through the Employees Stock Trust. This evidence is clearly sufficient to satisfy the third element required. Certainly there has been reliance by and prejudice to numerous concerned parties by the failure of Newhouse to bring this suit.[31] Newhouse simply waited too long to seek any redress through the courts.

We have determined that the law and the evidence preclude a legal conclusion that a conspiracy or any wrongful plan, scheme, or design between the directors existed. We have discussed the continuing wrong theory, and rejected it as inapplicable here. Any and all findings of the facts as to the existence of concealment or failure to disclose the facts on the part of the officers and directors complained about here are contrary to the great weight of the evidence and clearly erroneous. We find no legal obstacle to prevent the statute of limitations from running and from barring plaintiff's attack on the Children's Hospital stock purchase and on the creation of the Employees Stock Trust plan. Likewise, the defenses of acquiescence and laches would bar this action if we could conclude a cause of action existed.

The plaintiff-appellee has cross-appealed in this case and raises three points. Each point has been indirectly determined by what we have heretofore concluded.

First, appellee would have us assess against the directors the interest paid by the Post corporation upon the money borrowed to purchase the Children's Hospital stock. This argument is necessarily bottomed upon the assumption that the purchase of the stock was illegal. We have concluded the purchase was in accordance with the law of Colorado, and we reject this point. The second point raised pertains to the $500,000 accommodation loan by the Post corporation to Bonfils for the purchase of the Rippey stock. This loan was repaid by Bonfils within a day or two, and she thereafter paid interest to the Post upon the loan. Any contention that Bonfils made a profit of any kind on her purchase of the Rippey stock was without factual support. The third point goes to the refusal by the trial judge to allow a recovery against the directors for the expenditure of Post corporation money for attorney fees in the defense of the Rippey litigation. The trial judge made specific findings on this point.[32] We are unable to conclude that these findings are clearly erroneous, and they will not be disturbed.

One of the remaining points raised by appellants concerns the salaries approved by the directors late in 1967. At that time, both Seawell and Bonfils were receiving $50,000 a year. By action of the directors, these salaries were increased to $75,000 retroactive to January 1, 1967. The trial court struck down any salary increase for Bonfils and rejected the retroactive portion of the increase for Seawell.

The fixing of salaries by directors of a corporation falls within the "business judgment" rule.[33] This rule has, in substance, been recognized in

31. Boldenweck v. Bullis, 40 Colo. 253, 90 P. 634 (1907).

32. I find the corporation was justified in employing its own counsel in the Rippey suit. I have considered the arguments of plaintiff . . . .

I think that I must accept the argument of the Post that to a degree its reputation was involved there with regard to the conspiracy . . . . .

I find the evidence is insufficient to show that there was abuse of corporate judgment in connection with the allocation, . . . .

33. Bisbee v. Midland Linseed Prod. Co., 19 F.2d 24 (8th Cir. 1927), cert. denied, 275 U.S. 564, 48 S.Ct. 121, 72 L.Ed. 428; Langlois v. B. F. Merchant Inv. Co., 101 Colo. 438, 73 P.2d 1385 (1937).

Colorado by the adoption of several of the provisions of the Colorado Corporation Code. In regard to the fixing of salaries, 19 C.R.S. 31–5–1, heretofore set out in a footnote, gives directors express authority to fix compensation. After carefully considering the record as to the nature of the services performed for the Post corporation by both Seawell and Bonfils, we cannot conclude as the trial court did that the compensation voted by the two directors was without legal authority. To the contrary, the evidence clearly reflects the salaries voted to both Seawell and Bonfils were well within the range of legality.

The last point of our determination is the trial court's allowance of attorney fees to counsel for appellee in the amount of $300,000, to be paid by the Post corporation. From our disposition of the other issues in the case, this allowance of attorney fees must be set aside.

The judgment of the trial court is reversed, as indicated herein, and the case is remanded with directions to dismiss the action.